1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   WILLIAM THOMAS COATS,

11           Petitioner,                    No. 2:09-cv-1125 KJM KJN P

12        vs.

13   MIKE MCDONALD, Warden, et al.,

14           Respondents.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17           Petitioner is a state prisoner proceeding without counsel, with an application for a

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2007 conviction

19   on charges of spousal abuse, criminal threats, and false imprisonment.  The jury also found

20   petitioner had sustained three prior strike convictions under California's Three Strikes Law.

21   Petitioner was sentenced to 40 years to life in state prison.  Petitioner raises four claims that trial

22   counsel rendered ineffective assistance of counsel in violation of petitioner's Sixth Amendment

23   rights.

24           After careful review of the record, this court concludes that the petition should be

25   denied.

26   ////

1

II.  Procedural History

Petitioner was convicted by a jury of the crime of making criminal threats (California Penal Code § 422),[1] spousal abuse (California Penal Code § 273.5(a)),[2] and false imprisonment (California Penal Code § 236)[3].  (Clerk's Transcript ("CT") at 216.)  Petitioner was sentenced on December 5, 2007.  (CT at 216-17.)

////

---

[1]  Section 422 provides, in pertinent part:

> Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison.

Cal. Penal Code § 422.

[2]  Section 273.5(a) provides:

> Any person who willfully inflicts upon a person who is his or her spouse, former spouse, cohabitant, or the mother or father of his or her child, corporal injury resulting in a traumatic condition, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to six thousand dollars ($6,000) or by both that fine and imprisonment.

Cal. Penal Code § 273.5(a).

[3]  Section 236 provides:

> False imprisonment defined.  False imprisonment is the unlawful violation of the personal liberty of another.

Cal. Penal Code § 236.

Petitioner timely appealed, and on October 14, 2008, the California Court of Appeal, Third Appellate District, affirmed the judgment.  (Respondents' Lodged Document ("LD") 4.)  On November 25, 2008, petitioner filed a petition for review in the California Supreme Court.  (LD 5.)  On January 14, 2009, the California Supreme Court denied the petition for review.  (LD 5.)  Petitioner filed a petition for a writ of certiorari in the United States Supreme Court, which was denied on October 5, 2009.

On April 1, 2009, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Third Appellate District, Case No. 09F02635.  (LD 6.)  The superior court denied the petition by reasoned opinion issued May 15, 2008.  (LD 7.)  Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which was denied without comment on August 19, 2009.  (LD 10.)

Petitioner filed the instant petition on April 7, 2009.  (Dkt. No. 1.)

III.  Facts[4]

The opinion of the California Court of Appeal contains the following factual summary of petitioner's offenses:

> ***Prosecution case-in-chief***
>
> [Petitioner] and the victim, Tammy G., have known each other for 30 years. On New Year's Eve 2006 and in early January 2007, they began a dating relationship that included sexual activity. For two weeks to a month immediately prior to February 19, 2007, they lived together in the Sacramento area.[FN5]
>
>> [FN5.] The trial was in Sacramento County. Tammy testified that [petitioner] "recently moved up here." We reject [petitioner's] claim that "[t]he record reflects no evidence at all as to the supposed common dwelling location or type." Tammy's testimony supports an inference that the common dwelling was located in Sacramento County.

---

[4]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in <u>People v. Coats</u>, No. C057674 (October 14, 2008), a copy of which was lodged by Respondent as LD 4 on October 20, 2009.

On the afternoon of February 19, the couple traveled through Fair Oaks in [petitioner's] car. Tammy was driving and [petitioner] was in the front passenger seat. The couple, who were both from the San Francisco Bay Area, began arguing because [petitioner] wanted Tammy to drive him to Redwood City but she did not want to do so. She testified that he "was acting kind of like a child," and was having "a little tantrum fit." Their argument "got a little bit out of hand," and he hit her "[t]wo times" on the mouth or upper lip. After being struck, she wanted to get out of the car and tried to do so. However, she was unfamiliar with the car and did not know how to unlock the door.

Tammy remembered little about the incident, which had occurred nine months prior to her testimony. She did not recall [petitioner] doing anything to prevent her from unlocking the door. She recalled a male approaching the car window and asking if she needed help. She said, "yes, I need help. Please help me get out of this car." The man tried to open the car but he could not do so. Tammy testified that following the man's attempt, "everything just kind of like went blank." She did not recall other people approaching the car. She did not recall [petitioner] pouring fingernail polish remover and rubbing alcohol on her clothing; nor did she recall telling a police officer that he had done so. She did not remember [petitioner] stating that he "was going to light [her] on fire and kill [her]"; nor did she remember telling an officer that he had said so. However, she did remember that an officer had "forced" her into an ambulance that took her to a hospital where she refused treatment. Shown photographs of her injuries that had been taken shortly after the incident, Tammy testified that, other than "two little tiny cuts" on the top of her lips, the injuries depicted could have been preexisting because she "was drinking" and thus "fall [s] down a lot."

Sacramento County Sheriff's Deputy Jarred Hailey testified that he responded to a disturbance call and found Tammy in an ambulance with facial injuries. Her face was swollen and bruised, and she was bleeding from her mouth and nose. Hailey questioned Tammy but she was uncooperative and reluctant to answer any of his questions.

Eventually, Tammy told Deputy Hailey that [petitioner] had become very angry when she refused to drive him to Redwood City. As she drove down the street, he poured fingernail polish remover and rubbing alcohol on her clothing and told her he was going to "light her on fire" and "was going to kill her." [Petitioner] ignited a cigarette lighter, lit a piece of paper on fire and threw it in Tammy's direction. After throwing the burning paper, [petitioner] punched Tammy twice to the face and once to the back of the head, causing her to stop the car on the roadway. Several motorists and pedestrians appeared on the scene. Tammy tried to get out of the car but [petitioner] stopped her and held onto her. Eventually,

4

people broke out the passenger window and restrained [petitioner], allowing Tammy to escape.

John Hernandez testified that while he and his family were driving through Fair Oaks, the blue car ahead of them made several stops, reverse moves, and restarts. When Hernandez pulled up alongside the car at a stop sign, he could see [petitioner], who was sitting in the passenger seat, striking Tammy with the closed fist of his right hand, while he held her hair with his left hand. Hernandez parked his car and told his passenger to call "911." Then he approached the passenger side of the blue car and told [petitioner] to open the door; [petitioner] did not respond and just kept on hitting Tammy. He appeared to be hitting her as hard as he could. She was crying and attempting to cover her face. Hernandez heard [petitioner] tell Tammy, "I'm going to kill you."

Hernandez testified that a person from another car approached the driver's side window, tried to open the door, and evidently inquired if Tammy was okay. Hernandez heard Tammy say, "no, I'm not okay. I need help."

Hernandez was convinced that "something was going to happen." He again told [petitioner] to open the door and warned that he would break the window if [petitioner] did not comply. [Petitioner] continued to hit Tammy, so Hernandez retrieved a baseball bat from his truck and broke the passenger window.

Stephen Miele, a telephone lineman who was working in the area, overheard commotion and hollering. He drove to the scene and arrived as Hernandez was removing the baseball bat from his truck.

At about this time, Courtney Wyrick and her boyfriend Randy Crawford noticed the commotion and stopped their car to help. Wyrick observed [petitioner] hitting Tammy's face repeatedly with a closed fist. Tammy was crying but not fighting back. Wyrick observed Tammy trying to unlock the car door and roll down her window. [Petitioner] would roll the window back up and relock the door. Crawford saw [petitioner] strike Tammy when she tried to unlock the door.

After Hernandez broke open the car's front passenger window, Miele grabbed the hood of [petitioner's] sweatshirt and pulled him away from Tammy. Thus thwarted from hitting Tammy with his fists, [petitioner] resorted to kicking her arms and face. Eventually, Crawford and Miele pulled [petitioner] part way through the shattered window and pinned him with his arms behind his back. After Tammy managed to unlock the driver's side door, Wyrick opened the door and helped Tammy get out of the car. Wyrick noticed that Tammy's face was covered with blood and that she had purple bruises around her eyes. Wyrick tried to talk to Tammy but

she was hysterical and trembling. Wyrick then returned to the driver's side of the car to turn off its ignition.  [Petitioner] kicked her.

During the altercation Miele heard [petitioner] say, "I'm going to kill her. Get your hands off of me. I'm going to kill her." Crawford heard Tammy say, "help me, he's going to kill me."

Hernandez flagged down a passing fire truck.  [Petitioner] went limp and appeared to play dead when emergency personnel arrived. [Petitioner] was removed from the car and placed on the asphalt. He resumed fighting, and it took six emergency personnel to hold him down. Eventually [petitioner] was turned over to law enforcement.

Wyrick and Crawford both noticed that there was a very strong odor of an unknown substance in the interior of the blue car.

Crime scene investigators collected several items from the car's interior including tissue paper, a partially burned tissue paper roll, empty bottles of fingernail polish remover and rubbing alcohol, and three cigarette lighters.

A Sacramento Metropolitan Fire District investigator took Tammy's blouse and slacks into evidence. When the investigator first took possession of the clothes, he noted that they felt damp. The investigator testified that rubbing (isopropyl) alcohol and fingernail polish remover (acetone or ethyl acetate) are flammable liquids.

A state Department of Justice criminalist found residues of ethyl acetate and isopropyl alcohol on Tammy's blouse.

***Defense***

The defense rested without presenting any evidence or testimony.

(People v. Coates, slip op. 2-8.)

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

1    Federal habeas corpus relief is not available for any claim decided on the merits in

2  state court proceedings unless the state court's adjudication of the claim:

3          (1) resulted in a decision that was contrary to, or involved an
          unreasonable application of, clearly established Federal law, as
4          determined by the Supreme Court of the United States; or

5          (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the
6          State court proceeding.

7  28 U.S.C. § 2254(d).

8    Under section 2254(d)(1), a state court decision is "contrary to" clearly

9  established United States Supreme Court precedents if it applies a rule that contradicts the

10  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

11  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

12  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06

13  (2000)).

14    Under the  "unreasonable application" clause of section 2254(d)(1), a federal

15  habeas court may grant the writ if the state court identifies the correct governing legal principle

16  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

17  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

18  simply because that court concludes in its independent judgment that the relevant state-court

19  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

20  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

21  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

22  question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations

23  omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief

24  so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

25  Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

26  ////

1    The court looks to the last reasoned state court decision as the basis for the state

2    court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned

3    decision, "and the state court has denied relief, it may be presumed that the state court

4    adjudicated the claim on the merits in the absence of any indication or state-law procedural

5    principles to the contrary."  Harrington, 131 S. Ct. at 784-85.  That presumption may be

6    overcome by a showing that "there is reason to think some other explanation for the state court's

7    decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

8    Where the state court reaches a decision on the merits but provides no reasoning

9    to support its conclusion, the federal court conducts an independent review of the record.

10   "Independent review of the record is not de novo review of the constitutional issue, but rather,

11   the only method by which we can determine whether a silent state court decision is objectively

12   unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

13   decision is available, the habeas petitioner has the burden of "showing there was no reasonable

14   basis for the state court to deny relief."  Harrington, 131 S. Ct. at 784.  "[A] habeas court must

15   determine what arguments or theories supported or, . . . could have supported, the state court's

16   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

17   arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at

18   786.

19   V.  Petitioner's Claims

20   Petitioner raises four grounds that trial counsel rendered alleged ineffective

21   assistance of counsel in violation of petitioner's Sixth Amendment rights.  In ground one,

22   petitioner states he is

23    a mentally disabled person who was collecting disability checks
     while . . . a free person, . . . labeled CCCMS by the California
24   Department of Corrections and Rehabilitation, and have been so
     for many years.  [Petitioner] take[s] several psychotropic
25   medications for several mental disorders bi-polar, paranoid-
     schizophrenia with psychotic outbursts.  These were all mitigating
26   issues my trial counsel never raised at or during jury trial.

8

1 (Dkt. No. 1 at 4.)  In ground two, petitioner claims trial counsel "filed only 2 motions in a

2 criminal matter where the petitioner . . . was facing a possibility of multiple life sentences."  (Id.)

3 In ground three, petitioner contends trial counsel "did not pursue information on the background

4 of the victim," for example, her parole status.  (Dkt. No. 1 at 5.)  In the fourth ground, petitioner

5 states he gave trial counsel a list of defense witnesses petitioner wanted trial counsel to subpoena

6 for trial, but petitioner alleges trial counsel "refused to subpoena or call even one witness on

7 [petitioner's] behalf."  (Id.)  The court will first set forth the standards for reviewing ineffective

8 assistance of counsel claims, and will then address petitioner's claims.[5]

9        The Sixth Amendment guarantees the effective assistance of counsel.  The United

10 States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

11 Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

12 counsel, a petitioner must first show that, considering all the circumstances, counsel's

13 performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

14 identifies the acts or omissions that are alleged not to have been the result of reasonable

15 professional judgment, the court must determine whether, in light of all the circumstances, the

16 identified acts or omissions were outside the wide range of professionally competent assistance.

17 Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).

18        Second, a petitioner must establish that he was prejudiced by counsel's deficient

19 performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

20 probability that, but for counsel's unprofessional errors, the result of the proceeding would have

21 been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine

22 ////

23

24        [5] As noted by respondents, only two of these grounds were presented to the California
Supreme Court:  trial counsel's failure to present evidence of petitioner's mental disability and

25 failure to call any witnesses on petitioner's behalf.  "An application for a writ of habeas corpus
may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies

26 available in the courts of the State.") 28 U.S.C. § 2254(b)(2).

1  confidence in the outcome." Id.; see also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

2  F.3d 972, 981 (9th Cir. 2000).

3       In assessing an ineffective assistance of counsel claim "[t]here is a strong

4  presumption that counsel's performance falls within the wide range of professional assistance."

5  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (citation omitted).  Additionally, there is a

6  strong presumption that counsel "exercised acceptable professional judgment in all significant

7  decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citation omitted).

8       Recently, the Ninth Circuit clarified how courts must analyze ineffective

9  assistance claims under AEDPA.

10       Federal habeas courts must guard against the danger of equating
     unreasonableness under Strickland with unreasonableness under

11       § 2254(d).  When § 2254(d) applies, the question is not whether
     counsel's actions were reasonable.  The question is whether there is

12       any reasonable argument that counsel satisfied Strickland's
     deferential standard.

13

14  Harrington, 131 S. Ct. at 788.

15       The last reasoned rejection of this claim is the decision of the Sacramento County

16  Superior Court.  (LD 7.)  The state court addressed all four of petitioner's alleged ineffective

17  assistance of counsel claim as follows:

18       Petitioner claims ineffective assistance of counsel, in that he is a
     mentally disabled person who takes several psychotropic medications for

19       several mental disorders including bipolar disorder and paranoid
     schizophrenia with psychotic outburst, yet his counsel never raised this at

20       trial.

21       Petitioner, however, fails to specify what counsel should have
     done at trial that would have been reasonably likely to have made a

22       difference in the outcome; he does not claim that counsel should
     have expressed a doubt as to competency, or that he should have

23       pleaded not guilty by reason of insanity.  Nor does he attach any
     reasonably available documentary evidence to support such a

24       claim, requiring its denial (Strickland v. Washington (1984) 466
     U.S. 668; In re Swain (1949) 34 Cal.2d 300; In re Harris (1993) 5

25       Cal.4th 813, 827 fn. 5).

26  ////

1          Petitioner also claims ineffective assistance of counsel, in that his
2     trial attorney filed only two motions, failed to call even one witness
      in his defense even though petitioner gave him a list of defense
      witnesses petitioner wanted subpoenaed, did not pursue any
3     background information on the victim, including the victim's
      parole status, provided no defense whatsoever, and failed to confer
4     with petitioner even about whether petitioner was going to testify.

5          Again, petitioner fails to specify what counsel should have
      uncovered and presented at trial that would have been reasonably
6     likely to have made a difference in the outcome, nor does he attach
      any reasonably available documentary evidence to support the
7     claim, requiring its denial (<u>Strickland</u>, <u>supra</u>; <u>Swain</u>, <u>supra</u>; <u>Harris</u>,
      <u>supra</u>).

8

9   (LD 7 at 1-2.)

10          a.  <u>Possible Defenses</u>

11          In his traverse, petitioner faults defense counsel for failing to press defenses of

12   diminished capacity or insanity.  (Dkt. No. 21 at 1.)  Petitioner also states that presenting these

13   defenses would have yielded a different outcome.  (<u>Id.</u> at 2.)  Petitioner claims he "has been part

14   of the mental health community since 1980." (<u>Id.</u> at 4.)  Petitioner argues that if the jury were

15   made aware that petitioner suffered psychotic outbursts when not controlled with psychotropic

16   medications, "there probably would have been a different verdict."  (<u>Id.</u>)  Respondent argues that

17   petitioner failed to demonstrate how either of these defenses would have resulted in a different

18   outcome.

19          California no longer recognizes a diminished capacity defense.  <u>See</u> <u>People v.</u>

20   <u>Anderson</u>, 28 Cal. 4th 767, 782, 122 Cal. Rptr.2d 587 (2002) (In 1981, the Legislature abolished

21   diminished capacity.").  However, "[u]nder California law, a criminal defendant is allowed to

22   introduce evidence of the existence of a mental disease, defect, or disorder as a way of showing

23   that he did not have the specific intent for the crime."  <u>Patterson v. Gomez</u>, 223 F.3d 959, 965

24   ////

25   ////

26   ////

1   (9th Cir. 2000) (quoting Cal. Penal Code § 28(a)).[6]  The crime of making a criminal threat,

2   California Penal Code § 422, is a specific intent crime under California law.  (Reporter's

3   Transcript ("RT") at 212.)  False imprisonment and spousal abuse crimes are general intent

4   crimes.  (RT at 211.)

5        California also recognizes a defense of insanity in criminal proceedings.  See, e.g.,

6   Cal. Penal Code § 25.  California Penal Code § 25 provides in relevant part: "In any criminal

7   proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be

8   found by the trier of fact only when the accused person proves by a preponderance of the

9   evidence that he or she was incapable of knowing or understanding the nature and quality of his

10  or her act and of distinguishing right from wrong at the time of the commission of the offense."

11       In the instant action, in order for petitioner to prevail on his ineffective assistance

12  of counsel claim, petitioner must show, *inter alia*, that he was prejudiced by any unreasonable

13  error by his trial attorney.  With respect to the possible defenses, one element necessary to

14  establish prejudice is a showing that the defenses "likely would have succeeded at trial."  Hill v.

15  Lockhart, 474 U.S. 52, 59 (1985).  Petitioner has failed to provide probative evidence of

16  petitioner's history of mental illness, or to demonstrate the role that illness played in petitioner's

17  intent during the crimes, or his capacity to know and understand what he was doing during the

18  crimes, or his ability to distinguish right from wrong when he attacked his cohabitant in the car.

19  For these reasons, petitioner cannot show that he was prejudiced by counsel's failure to pursue

20  possible defenses related to his mental illness.  Petitioner has failed to show that either a defense

21  of not guilty by reason of insanity, or a defense that petitioner's mental illness prevented him

22  

---

23      [6]  California Penal Code § 28(a) provides: "Evidence of a mental disease, mental defect,
    or mental disorder shall not be admitted to show or negate the capacity to form any mental state,
24  including but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice
    aforethought, with which the accused committed the act. Evidence of mental disease, mental
25  defect, or mental disorder is admissible solely on the issue of whether or not the accused actually
    formed a required specific intent, premeditated, deliberated, or harbored malice aforethought,
26  when a specific intent crime is charged."

1    from actually forming the specific intent for making criminal threats, likely would have

2    succeeded at trial.  The state court's rejection of this claim was not contrary to controlling

3    principles of United States Supreme Court precedent.  Accordingly, this claim should be denied.

4                    b.  Remaining Allegations

5           Petitioner also contends he suffered ineffective assistance of counsel based on the

6    ground that defense counsel only filed two motions, failed to investigate the victim's

7    background, and failed to call defense witnesses.  However, all of these claims fail because

8    petitioner has failed to demonstrate that had defense counsel investigated the victim's

9    background, called defense witnesses, or filed other motions, it is likely the outcome of this case

10   would have been different.

11          Defense counsel in this case faced daunting evidence.  Not only were there

12   eyewitnesses to the crimes, but the witnesses interceded to aid the victim during the crimes.

13   Petitioner was arrested at the scene of the crimes.  Witnesses John Hernandez, Stephen Miele,

14   Courtney Wyrick, and Randy Crawford, all testified that they witnessed petitioner assaulting the

15   victim, striking her several times, and each explained their roles in attempting to help the victim

16   get away from petitioner and out of the car.  (RT at 32-41; 60-66; 81-87; 179-87.)  The victim,

17   Tammy Gardella, also testified.  (RT at 91-119.)  Ms. Gardella testified that she did not want to

18   press charges, did not want to get petitioner into trouble, and had difficulty recalling the details of

19   what happened on the day of the assault.  (RT at 95, 97.)  However, Ms. Gardella testified that

20   she thought petitioner punched her two times in the mouth, and one time on the side of the head,

21   she was trying to get out of the car, and that she was "scared a little bit," and frightened.  (RT at

22   95, 101, 117.)

23          In his traverse, petitioner claims defense counsel should have called as witnesses a

24   psychiatrist or petitioner's former parole agent, who would testify as to petitioner's psychiatric

25   issues.  However, petitioner did not provide an affidavit from any of these witnesses, nor provide

26   any factual basis for how this would have changed the outcome here.  Petitioner does not suggest

1   what other motions defense counsel should have brought, but simply claims he is not an attorney

2   so would not know what motions should be filed.  (Dkt. No. 21 at 5.)

3            With regard to defense counsel's failure to investigate the victim's background,

4   petitioner claims this was important to impeach the testimony of the victim, Tammy Gardella, "to

5   show the jury she had every reason to deflect the authorities' attention away from her and onto . .

6   . petitioner."  ((Dkt. No. 21 at 6.)  However, even if defense counsel had impeached the victim's

7   testimony, petitioner does not address the strong testimony of the four other eyewitnesses to the

8   crimes.  Petitioner has failed to demonstrate how impeaching the victim would have changed the

9   outcome in light of the testimony of the four eyewitnesses.[7]

10           The Sacramento County Superior Court properly applied <u>Strickland</u> in denying

11   petitioner's ineffective assistance of counsel claims.  Therefore, the state court's rejection of

12   petitioner's ineffective assistance of counsel claims was neither contrary to, nor an unreasonable

13   application of, controlling principles of United States Supreme Court precedent.  Petitioner's

14   second, third and fourth claims should also be denied.

15   VI.  <u>Conclusion</u>

16           Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

17   a writ of habeas corpus be denied.

18           These findings and recommendations are submitted to the United States District

19   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

20   one days after being served with these findings and recommendations, any party may file written

21   objections with the court and serve a copy on all parties.  Such a document should be captioned

22   "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files

23

24           [7]  In his traverse, petitioner includes a claim that defense counsel failed to discuss whether
     petitioner should take the stand and testify.  (Dkt. No. 21 at 4.)  Although petitioner raised this
25   claim in the Sacramento County Superior Court petition, he did not raise this claim in the instant
     petition.  "A Traverse is not the proper pleading to raise additional grounds for relief."
26   <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1995).

1  objections, he shall also address whether a certificate of appealability should issue and, if so, why

2  and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

3  the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

4  § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after

5  service of the objections.  The parties are advised that failure to file objections within the

6  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

7  F.2d 1153 (9th Cir. 1991).

8  DATED:  April 4, 2011

9

10                                          _____
                                           KENDALL J. NEWMAN
11                                          UNITED STATES MAGISTRATE JUDGE

12  coat1125.157

13

14

15

16

17

18

19

20

21

22

23

24

25

26